[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1055 
¶ 1. In this medical malpractice case, Bobby T. and Peggy Williams sued Bobby's doctors as the result of a five-inch hemostat being left in his body during surgery. The case was presented to a jury which returned a verdict against the doctors and awarded damages to Bobby in the amount of $10, 000. The jury did not return any damages for Peggy on her lost of consortium claim.
 ¶ 2. After the trial court denied a motion for a new trial or an additur, the Williamses filed this appeal in which they argue that they should have been granted a directed verdict on the issue of liability. They also allege that counsel for the hospital engaged in improper closing argument and that the jury was improperly and unduly influenced by bias, prejudice or passion and outside sources. Finally, the Williamses contend that the jury was unduly concerned with the liability of the hospital, that the damages awarded were contrary to the overwhelming weight of the credible evidence, and that Mrs. Williams suffered some damages although the jury failed to award her any.
 FACTS ¶ 3. In addition to the medical malpractice claim against the doctors, the Williamses also brought a claim against Delta Regional Medical Center Hospital under the Mississippi Torts Claim Act. *Page 1056 
This claim against the hospital was tried by the judge who awarded a judgment against the hospital in the amount of $50,000. This separate judgment is not part of this appeal.
 ¶ 4. This appeal only concerns the $10,000 jury verdict rendered against the doctors.
 ¶ 5. The doctors admitted that a surgical instrument, a hemostat, was left in Williams's pelvis during one of two surgeries. On March 24, 1998, Dr. Hugh Gamble, II, performed a resection of an abdominal aortic aneurysm on Williams. On May 25, 1998, Dr. John Brooks performed a repair of a left direct inguinal hernia and a repair of an incisional hernia on Williams. The doctors assisted each other in the surgeries. It was during one of these surgeries that the hemostat was left in Williams's body.
 ¶ 6. A CT scan was taken in May 1999 that revealed the presence of the hemostat. The hemostat was not removed until July 8, 1999, because Williams was preparing to undergo heart surgery in May of 1999 when the hemostat was discovered. It was fifty-seven days from the discovery of the hemostat until it was removed.
 ANALYSIS AND DISCUSSION OF THE ISSUES 1. Whether the trial court erred in failing to grant a directed verdict on the issue of liability
 ¶ 7. "This Court conducts a de novo review of motions for directed verdict. . . . If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury, the motion should not be granted." Pace v. Fin. Sec. Life of Miss.,608 So.2d 1135, 1138 (Miss. 1992).
 ¶ 8. Although it is undisputed that the instrument was left in Williams during surgery, this does not resolve the question of liability. While the doctors performing the surgery are responsible for counting the instruments during and following the procedure, the doctors may and do delegate the physical counting to nurses.
 ¶ 9. As a separate discussion, Delta Regional Medical Center admitted its staff failed to insure that the instrument count was properly performed and reported to Drs. Brooks and Gamble that all the instruments had been accounted for when, in fact, one instrument was left in Williams's pelvis.
 ¶ 10. Dr. Renea Dotson testified as an expert witness for the defendants/appellees. She testified that after having visually inspected the area of the operation and palpating the exposed areas and upon receiving a correct instrument count, a surgeon should close the operation wound without further manipulation. She stated that the excess handling of the body's internal organs could cause post-operative adhesions. Dr. Dotson explained that the hemostat was found in Williams's pelvis between the folds of the small intestine and would not have been visible or palpable under the circumstances.
 ¶ 11. Dr. Gamble testified for the jury as to the surgery performed on Williams. He testified as to the visual inspection of the operation area and that he palpated in that field. He also testified that the hemostat was not in an area where it could be seen or palpated following the aneurysm repair. Dr. Gamble testified that if the instrument count had been reported as incorrect, that an x-ray would have been taken to show the location of the instrument. He testified that he would not have closed without an x-ray if he had been advised that an instrument was missing.
 ¶ 12. Dr. John Brooks also testified, consistent with the testimony of Drs. Dotson *Page 1057 
and Gamble, as to the procedure for searching for and locating the hemostat if he had been advised by hospital personnel that the instrument was missing.
 ¶ 13. The plaintiff's expert witness was Dr. E.B. Kleier, Jr. His testimony was not in conflict with that of Drs. Dotson, Gamble, and Brooks as to what occurs during surgery when an instrument count is reported as incorrect. Dr. Kleier agreed that if the doctors had been told by the hospital's surgery crew that the instrument count was incorrect, that this would not have happened.
 ¶ 14. In Coleman v. Rice, 706 So.2d 696 (Miss. 1997), cited by the appellant, a sponge was left inside the abdomen of a patient. On appeal, the supreme court remanded the case for further proceedings where the circuit court had granted summary judgment for the defendant doctors. The court stated that leaving an object in a patient is not negligence per se, but raises a presumption of negligence which the surgeon may rebut or explain.Id. at (¶ 12) 699. In the present case, the doctors offered an explanation as to how a hemostat could be left in a patient.
 ¶ 15. Considering the testimony before it, the trial court was correct in submitting the issue of liability to the jury. Given that the jury returned a verdict for the Williamses, we cannot say that even if the decision of the trial court was incorrect, that there is cause for reversal.
 2. Whether the hospital improperly argued before the jury in closing argument
 ¶ 16. Williams contends that certain comments made by the attorney for Delta Regional Medical Center during closing argument created a bias and prejudice which should result in a new trial on the issue of damages.
 ¶ 17. Two objections were raised during the argument. The first came after the following:
 As I see where we are today in this state, the civil justice system that's designed to compensate someone who has been injured, a system that was designed to settle disputes is in a crisis. The system suddenly has resolved itself into a system where people have been encouraged to exaggerate their complaints and then has rewarded them for that exaggeration.
The objection was sustained. There was no request that the jury be admonished to disregard the statements.
 ¶ 18. The second objection was based on a comment by the hospital's attorney that the defendant's Exhibit 42 would be provided to the jury. This exhibit contained Williams's medical records to counter the claim that Williams suffered any substantial or other injuries or damages as a result of the hemostat being in his body. Counsel went through the records commenting on the contents and pointing out that the records did not support Williams's allegations. There is no indication that counsel's comments were inappropriate. We fail to see how either of these remarks would be the basis for a new trial.
3. Whether Bobby Williams is entitled to an additur
 ¶ 19. Under this assignment of error, the Williamses argue that there were $34,000 in stipulated medical expenses and that the jury only awarded $10,000. The doctors contend that there was no stipulation and that they stipulated only that Mr. Williams claimed to have $34,000 in damages as a result of their alleged negligence.[1] *Page 1058 
The Williamses offer little argument to support this issue other than the amount of the alleged stipulation and reiterating that Mr. Williams knew he had the hemostat in his body for fifty-seven days.
 ¶ 20. Of the nearly $34,000 in damages claims, only approximately $5,700 relates to the cost of removing the hemostat from Williams. Also included in the $34,000 claimed by the Williamses is the cost of the CT scan when the hemostat was discovered in May 1999. This CT scan was requested by Williams's cardiologist in preparation for cardiac bypass surgery. The amount claimed also included the cost of additional incisional hernia repair surgery which was performed in April 2000 after the hemostat was removed in July 1999. Williams claimed as an additional theory of negligence that the incisional hernia repair by Dr. Brooks in May 1998 was negligent, but the appeal does not contain argument on this alleged negligence.
 ¶ 21. The Court's authority to grant an additur is found in Mississippi Code Annotated 11-1-55 (Rev. 2002):
 The supreme court or any other court of record in a case in which the money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
Thus, an additur may be awarded: (1) if the court finds that the jury was influenced by bias, prejudice, or passion or (2) if the damages were contrary to the overwhelming weight of credible evidence. Rodgers v. Pascagoula Public School Dist.,611 So.2d 942, 944 (Miss. 1992). In addition, "the party seeking the additur has the burden of proving his injuries, damages and loss of income. In determining whether this burden is met, the Court must review the evidence in the light most favorable to the defendant, giving that party all favorable inferences that reasonably may be drawn therefrom." Id. at 945.
 ¶ 22. Looking at the evidence favorably toward the doctors, we are unable to find that the verdict was the product of bias, prejudice or passion. There was no direct evidence that the hemostat caused any particular problem for Williams. During the time he was aware of the hemostat, he was recovering from heart surgery. At the time he was retired and, apart from the actual cost of the additional surgery to remove the hemostat, there was no particular evidence of damages. The amount awarded by the jury is more than the cost of the surgery to remove the hemostat, which Williams states was $5,700. We, therefore, find that there is support for the jury's findings. *Page 1059 
 4. Whether Peggy Williams is entitled to a loss of consortium damages
 ¶ 23. Mrs. Williams also sought damages as a result of the hemostat being left in her husband after surgery. She testified that "she was afraid for him" and that she was "afraid to snuggle up [to him] at night." She also testified, "We just can't have sexual relationship anymore. . . ."
 ¶ 24. Mrs. Williams testified that at the time the hemostat was discovered, she found her husband on two occasions when he was very white, cold and clammy to the touch. She later testified that he had similar episodes as early as 1990. There was no medical testimony relating these episodes to the hemostat.
 ¶ 25. As previously discussed, the fifty-seven days in which Williams was aware of the presence of the hemostat were also days in which Williams was recovering from open heart surgery. None of his complaints were ever specifically attributed to the hemostat.
 ¶ 26. As to the loss of sexual relations, there was never any connection established between the hemostat and loss of sexual function. In fact, Mrs. Williams testified that her husband suffered from erectile dysfunction before either of the surgeries performed by Drs. Brooks and Gamble. She admitted that he was on Viagra and that he was taken off Viagra after he underwent heart surgery. She stated that their family physician attributed the problem to heart disease.
 ¶ 27. In American National Ins. Co. v. Hogue, 749 So.2d 1254
(¶ 29) (Miss.Ct.App. 2000), this Court stated:
 The question quite simply is whether based on the evidence presented the jury had to award damages for a loss of consortium. A spouse's right of recovery on this claim is limited to loss of society and companionship, interference with conjugal rights and providing previously unnecessary physical assistance. Tribble v. Gregory, 288 So.2d 13, 17 (Miss. 1974). When the jury awarded no loss of consortium damages, they rejected as either irrelevant or unconvincing the . . . testimony concerning [the husband's] damages. . . .
In discussing this issue, the Mississippi Supreme Court stated that even when "[t]here was no evidence on the issue of consortium damage except the testimony of [the spouse] herself," then the "jury is free to disbelieve her." Alldread v. Bailey,626 So.2d 99, 102 (Miss. 1993) (quoting Anderson v. Mutert,619 S.W.2d 941, 945 (Mo.App. 1981)).
 ¶ 28. In reviewing Mrs. Williams's testimony, we are unable to find that she suffered any loss specifically related to the presence of the hemostat. We find no error in the jury's failure to award her damages.
 5. Whether the jury was unduly concerned with the liability of the hospital
 ¶ 29. During the deliberations, the jury sent a note to the judge which stated, "Are the doctors hired by the hospital, do they just have operating privileges." After conferring with the lawyers, the court told the jury to just rely on their collective memory. No objection was raised at that time by the Williamses. In fact, no specific objection was raised which would relate to this argument on appeal.
 ¶ 30. The failure to raise an issue in the trial court by way of objection or otherwise bars the appellant from raising this issue for the first time on appeal. Triplett v. City ofVicksburg, 758 So.2d 399, 401 (¶ 9) (Miss. 2000); Shaw v. Shaw,603 So.2d 287, 292 (Miss. 1992). *Page 1060 
 ¶ 31. Even without the procedural bar, we find nothing in the Williamses' argument which supports this issue on appeal.
 6. Whether the jury was improperly influenced by bias, prejudice, or passion
 ¶ 32. This argument is based on the $10,000 jury verdict and the Williamses' argument that they incurred $34,000 in damages. Again, the doctors dispute both that the amount of damages was stipulated, and that the jury verdict does not accurately reflect the damages sustained by Williams. Contrary to the Williamses' argument, the amount of medical expenses was contradicted and there was no admission of negligence on the part of the doctors. As stated by Williams, the cost of the surgery to remove the hemostat was less than $6,000.
 ¶ 33. Much is made of the fact that Williams experienced back pain all the time that the hemostat was in his body and that this allegedly restricted his ability to play golf during the twelve to sixteen month period that the hemostat was in his body. Several family members and friends testified as to his pain and difficulty playing golf. The problem is that there is no medical testimony which reflects that the hemostat in his body was the cause of or related to the back pain.
 ¶ 34. Without support in the record, we are left with the decision of the jury and find no error in that decision.
7. Whether the jury was unduly influenced by outside sources
 ¶ 35. On May 8, the U.S. Chamber of Commerce issued a news release attacking the Mississippi judicial system, specifically large jury verdicts and lawsuits in Mississippi. The trial in this case was from May 6 to May 13. During a bench conference, the trial judge expressed concern that "the Court is very much concerned that these types of questions in this climate, that almost daily we have articles appearing about the number of lawsuits against local physicians in the Delta area." The court sustained the defendant doctors' objection to questioning by the plaintiffs as to whether it is common for doctors to refuse to criticize other doctors. The trial judge made other remarks in the bench conference, stating, "For the record, I'm going to go further and to say, and I believe one Judge even ruled, that such publicity that is currently going on in another medical malpractice suit is kin to a campaign."
 ¶ 36. These comments by the trial judge were not made in open court and there is no indication that this particular jury was influenced by any of the publicity which may have been in the local or national media. In fact, the jury was thoroughly questioned regarding the influence of tort reform and the U.S. Chamber of Commerce articles during voir dire by plaintiffs' counsel. The jury agreed to try the case based on the facts, the evidence, and the trial court's instructions. Apart from the appellant's speculations, there is no evidence to support this issue on appeal.
 ¶ 37. Also, this issue was not raised by the Williamses in the trial court and is not properly before this Court. Triplett,758 So.2d at 401 (¶ 9); Shaw, 603 So.2d at 292. Consequently, we can find no error.
 ¶ 38. It is not the place for this Court to replace its judgment for that of the trial court, nor can the Court enter into speculation as to what would have happened if proper objections had been raised in the trial court. We, therefore, find that the judgment of the jury and trial court will be affirmed. *Page 1061 
 ¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTYIS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THEAPPELLANTS.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
[1] The record reflects the following stipulation:
 (COUNSEL FOR THE DOCTORS) Your Honor, I would offer this as a way to resolve this and move along. I would agree to entering into a stipulation with Plaintiffs that their claim for medical expenses as a result of the alleged negligence of the Defendant is in the amount of $33,000 and whatever that work out to [sic]. That is their claimed amount, and those expenses were incurred.